IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KATHLEEN MURRAY,                    )
                                    )
v.                                  )        No. 3:12-0410
                                    )
CAROLYN W. COLVIN,                  )
         Acting Commissioner of     )
         Social Security[1]         )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is not supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 14) should be GRANTED to the extent

that the case should be REMANDED.


## I. INTRODUCTION

In September 2008, the plaintiff protectively filed for DIB, alleging a disability onset date

of April 5, 2008, due to bipolar disorder and "problems" with her knees, legs, neck, and bladder.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this case.

(Tr. 10, 113-16, 133.) Her application was denied initially and upon reconsideration. (Tr. 47-51, 53-54.) The plaintiff testified at a video hearing before Administrative Law Judge Donald Rising ("ALJ") on September 14, 2010 (tr. 10, 24-46), and on October 26, 2010, the ALJ entered an unfavorable decision. (Tr. 10-19.) On February 25, 2012, the Appeals Council denied the plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.)

## II. BACKGROUND

The plaintiff was born on March 20, 1963, and she was 45 years old as of her alleged disability onset date. (Tr. 113.) She attended school through the 11th grade and worked as a cashier and fast-food cook. (Tr. 27-28.) In addition to her physical impairments, the plaintiff also alleged having mental impairments that are addressed in the ALJ's decision. However, the plaintiff only raises issues pertaining to her physical impairments in her memorandum in support of her motion for judgment on the record. *See* Docket Entry No. 14-1. Consequently, the Court will focus its review of the medical evidence and hearing testimony on the plaintiff's alleged physical impairments.

### A. Chronological Background: Procedural Developments and Medical Records

In 2005 and 2006, the plaintiff presented to Saint Thomas Hospital ("Saint Thomas") on several occasions with urinary frequency and urgency and for treatment of urinary tract infections. (Tr. 210-48.) In November 2007, she presented to Saint Thomas with bilateral leg swelling and pain in her knees. (Tr. 367.) She was prescribed Ibuprofen and advised to continue wearing support

stockings. *Id.* She asked for and was given a letter for work restricting her to five hours per day until the problems with her legs could be "determined." *Id.* A November 27, 2007 ultrasound was negative for deep venous thrombosis in the lower extremities. (Tr. 257.)

The plaintiff sought treatment for pelvic pain and urinary incontinence, frequency, and urgency under the care of Dr. Jeff Whitfield, a urologist. (Tr. 258-61, 278-86, 390-98.) In July 2008, she underwent a cystoscopy, hydrodistention, and bladder biopsy, the results of which were "consistent with interstitial cystitis."[2] (Tr. 258-61.) Dr. Whitfield diagnosed the plaintiff with interstitial cystitis, prescribed her medications, and administered a series of bladder treatments. (Tr. 279-86.) On September 10, 2008, the plaintiff reported that she was not experiencing frequent urination or uncontrolled loss of urine (tr. 283), but on September 24, 2008, she reported "constant pelvic pain" and urinary urgency without dysuria. (Tr. 281.) Treatment notes indicated that her bladder treatments were helping (tr. 281), and on October 22, 2008, Dr. Whitfield observed that she "seem[ed] to be doing well." (Tr. 279.) The plaintiff returned in April 2009 for a bladder treatment and denied experiencing frequent, uncontrolled, or painful urination. (Tr. 394-98.) At a follow-up visit in April 2010, she complained of pelvic discomfort and low back pain[3] but denied having dysuria, frequent urination, or uncontrolled loss of urine, and she "did not want a bladder treatment." (Tr. 390-91.)

---

[2] Interstitial cystitis is an inflammation of the urinary bladder and typically causes "urinary frequency and pain on bladder filling and at the end of urination." Dorland's Illustrated Medical Dictionary 466 (30th ed. 2003).

[3] Although Dr. Whitfield's treatment notes indicate that the plaintiff "continue[d] to have pelvic discomfort and low back pain," in a review of symptoms, he indicated that she had "[n]o back pain." (Tr. 390.)

In October 2008, the plaintiff was seen at Saint Thomas for chronic low back pain and right knee pain. (Tr. 292, 363.) An x-ray of her knee showed mild osteoarthritis with no acute abnormality, and an x-ray of her back was unremarkable. (Tr. 295-96.) She returned in November with right knee pain and was prescribed Lortab. (Tr. 362.) At a follow-up visit in December, she still had knee pain and swelling as well as low back pain, but treatment notes indicated that Lortab had "helped." (Tr. 360.) On January 5, 2009, the plaintiff presented to the Baptist Hospital emergency room, reporting that she had accidently fallen two days earlier and was experiencing pain in her low back and right knee. (Tr. 328-39.) An x-ray of her knee showed "[n]o acute abnormality" but "[m]oderate degenerative joint disease" (tr. 338), and an x-ray of her low back revealed mild scoliosis and osteophytosis. (Tr. 339.) An x-ray of her sacrum and coccyx showed "mild subluxation at the sacrococcygeal junction, most likely post-traumatic" (tr. 338-39), and she was diagnosed with a closed fracture of her sacrum and coccyx with no evidence of spinal cord injury. (Tr. 328.) Upon discharge, she demonstrated "no deficits" in her musculoskeletal system, although she did have some muscle pain and bruising. (Tr. 328-29.) She went to Saint Thomas on February 2, 2009, for follow-up care complaining of pain in her low back and "tailbone." (Tr. 359.)

On April 28, 2009, Dr. Nathaniel Robinson, a Tennessee Disability Determination Services ("DDS") nonexamining consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 380-88.) Dr. Robinson opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. 381.) He opined that she was not limited pushing and/or pulling; could occasionally perform postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling; and had no visual, communicative,

manipulative, or environmental limitations except for the need to avoid concentrated exposure to hazards such as machinery or heights. (Tr. 381-84.) Dr. Robinson based these findings on degenerative changes in the plaintiff's lumbar spine and right knee as well as obesity. (Tr. 385.)

A lumbar spine x-ray on June 19, 2009, showed "no evidence of disc disease" but revealed possible "very early degenerative arthritic changes" and an "increased lumbosacral angle which could cause lumbosacral strain." (Tr. 405.) A lumbar spine MRI on May 7, 2010, revealed "[n]o significant abnormality." (Tr. 401.)

From June 24, 2010, until August 9, 2010, the plaintiff received treatment from Dr. Tom Henderson. (Tr. 437-39.) At the plaintiff's initial visit on June 24, 2010, Dr. Henderson observed that she was "overweight," and she reported having pain in her left ovary region, low back, neck, arms, and legs; difficulty sleeping; interstitial cystitis; and a history of psychological problems. (Tr. 438.) The plaintiff also reported that an x-ray of her spine had shown degenerative joint disease and that a lumbar MRI had revealed a "large spot" over her left ovary. *Id.* Dr. Henderson observed that the plaintiff demonstrated positive Waddell signs.[4] *Id.* He diagnosed her with bipolar disorder and "chronic pain/fibromyalgia." *Id.* On July 2, 2010, the plaintiff underwent a pelvic ultrasound, which showed no abnormalities except for status post hysterectomy, and the left ovary could not be seen. (Tr. 439.) The plaintiff also saw Dr. Henderson on July 6, and July 23, 2010, with complaints of pain and psychological problems, and Dr. Henderson adjusted her medications. (Tr. 437.) On July 23, 2010, Dr. Henderson indicated that the plaintiff had asked that he fill out her "disability

---

[4] Waddell signs may indicate whether a patient with low back pain is exaggerating symptoms. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 419-20 (6th Cir. 2008).

paperwork," and he observed that, "I see no reason that we cannot do that especially because the majority of it is what the [plaintiff] tells us anyway." *Id.*

On August 9, 2010, Dr. Henderson completed a Medical Source Statement assessing the plaintiff's ability to physically perform work-related activities. (Tr. 440-46.) He opined that she could lift and/or carry up to ten pounds frequently, lift up to twenty pounds occasionally, and never carry more than ten pounds. (Tr. 440.) He based this opinion on the plaintiff's "fibromyalgia pain" and osteoarthritis as well as her "knees and [degenerative] disc lumbar disease" of which he noted there were x-rays that he had "not seen." *Id.* Dr. Henderson opined that, in an eight-hour workday, the plaintiff could sit for two hours at a time and three hours total; stand for one hour at a time and two and a half hours total; walk for thirty minutes at a time and one and a half hours total; and recline for one hour total. (Tr. 441.) He based these opinions on the plaintiff's "fibromyalgia, [osteoarthritis] of [the] knees, [and] lumbar [degenerative] disc disease." *Id.* Dr. Henderson opined that the plaintiff could occasionally reach, handle, finger, feel, push, and pull but never operate foot controls, climb, balance, stoop, kneel, crouch, or crawl. (Tr. 442-43.) He also opined that she could occasionally be exposed to humidity, wetness, and vibrations but could never operate a motor vehicle or be exposed to unprotected heights, moving mechanical parts, extreme temperatures, or pulmonary irritants. (Tr. 444.) Finally, citing the plaintiff's fibromyalgia, "OCD disorder," degenerative disc disease, and bipolar disorder, Dr. Henderson opined that the plaintiff could not shop, travel without a companion for assistance, or climb a few steps at a reasonable pace with the use of a single hand rail. (Tr. 445.) He indicated that she could climb a few steps at a reasonable pace on rough or uneven surfaces "but [not] without pain." *Id.*

**B. Hearing Testimony**

At the hearing on September 14, 2010, the plaintiff was represented by counsel, and the plaintiff and the vocational expert ("VE"), Anne Thomas, testified. (Tr. 24-46.) The plaintiff testified that she is 5'8" tall and weighs 230 pounds. (Tr. 27.) She testified that she lives in an apartment with her daughter, age 23, and grandson, age 4. *Id.* She said that she attended school through the 11th grade and has worked as a cashier and cook at fast-food restaurants as well as a cashier at retail and grocery stores. (Tr. 27-28.) She said that she stopped working because her last employer "closed down" and that, before the store closed, she worked part-time because of her leg and back "disability." (Tr. 28-29, 36-37.)

The plaintiff testified that she has osteoarthritis in her knees and degenerative disc disease in her back and that she was recently diagnosed with fibromyalgia. (Tr. 29-31.) She said that her right leg and back hurt "all the time" and that her back pain has gotten worse in the past year. (Tr. 30-31.) She related that she takes Neurontin for bladder pain, Tegretol for bipolar disorder, Celexa for depression, and Klonopin for anxiety and panic attacks. (Tr. 32-33, 35.) She explained that she was diagnosed with interstitial cystitis, which she related was "very painful" and caused her to need to go to the bathroom "every 30 minutes to an hour" or, on a "bad day," every 15 minutes. (Tr. 33.) She said that she is able to get dressed and use bathroom facilities by herself. (Tr. 33-34.)

She testified that when she is home she sits or rests in bed because she is in pain. (Tr. 34.) She estimated that she can sit or stand about thirty minutes before needing to lie down. *Id.* She said that she cannot drive a car and has never had a driver's license because she is "a very nervous person." *Id.* She said that she is able to shop but that her daughters often go for her because she "[does not] do really good out in public with a lot of people." *Id.* When asked how she was able to

work in a grocery store, she replied that "it was really hard" and that she "cried a lot" and had "a lot of anxiety . . . [and] a lot of depression." *Id.* She said that her managers "knew of [her] problems" and that she "would go home a lot." (Tr. 34-36.) She said that she does not have any hobbies but goes to church once a week. (Tr. 35.) She explained that fewer than eight people attend her church. *Id.*

The VE classified the plaintiff's past work as a cashier as light and unskilled and her past work as a short-order cook as light and semiskilled. (Tr. 40.) The ALJ asked whether a hypothetical person with the plaintiff's age, education, and work experience would be able to work if she were able to lift and carry ten pounds frequently and twenty pounds occasionally; could not stand or walk for more than four hours in an eight-hour workday; could occasionally climb, balance, stoop, kneel, crouch, and crawl; could not be exposed to hazardous settings; and could perform jobs involving simple instructions, casual and infrequent contact with the general public, and infrequent changes. (Tr. 40-41.) The VE testified that such a person could not perform the plaintiff's past relevant work but could work in representative jobs as a production assembler, production laborer, and hand packer. (Tr. 41.)

Next, the ALJ asked whether the availability of jobs would be affected if the hypothetical person also needed a sit/stand option and could neither sit nor stand for greater than thirty minutes at a time. *Id.* The VE responded that these additional limitations would not further erode the availability of jobs. (Tr. 41-42.) The VE also indicated that a person who was unable to remain in an upright position for more than two hours in an eight-hour workday would be unable to perform any work. (Tr. 42.) In response to questioning by the plaintiff's attorney, the VE testified that a

person who needed to take a bathroom break every fifteen minutes would not be able to perform the jobs that the VE identified. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on October 26, 2010. (Tr. 10-19.) Based upon the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since April 5, 2008, the alleged onset date (20 CFR 404.1571 *et seq*.).

\*\*\*

3. Ms. Murray has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR 404.1520(b) and (c). The impairment(s) include osteoarthritis of the right knee, degenerative arthritis of the lumbar spine, interstitial cystitis with frequent and painful urination, and diagnosed personality and bipolar disorders with bouts of anxiety and panic attacks.

\*\*\*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\*\*\*

5. Claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that involves standing or walking up to 4 hours in an 8 hour day and features only occasional climbing, balancing, stooping, kneeling, crouching or crawling with no exposure to hazardous settings. Ms. Murray is further limited to work requiring only simple or low level detailed instructions/tasks with infrequent changes in routine and only casual/infrequent contact with co-workers or the public.

\*\*\*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

***

7.      The claimant was born on March 20, 1963 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

***

11.      The claimant has not been under a disability, as defined in the Social Security Act, from April 5, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-18.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's

decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she

seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment and that the

impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying

his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 12.) At step two, the ALJ determined that the plaintiff had a combination of impairments that the ALJ considered severe, including "osteoarthritis of the right knee, degenerative arthritis of the lumbar spine, interstitial cystitis with frequent and painful urination, and diagnosed personality and bipolar disorders with bouts of anxiety and panic attacks." (Tr. 12-14.) At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15.) At step four, the ALJ determined that the plaintiff was not

capable of performing her past relevant work. (Tr. 17.) At step five, the ALJ determined that the plaintiff was capable of performing work as a production laborer, hand packer, and production assembler. (Tr. 18.)

## C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred by: (1) failing to consider her obesity and the effect it may have on her functional ability; (2) failing to give proper weight to Dr. Henderson's opinion; and (3) failing to consider the effect that interstitial cystitis may have on her functional ability. Docket Entry No. 14-1, at 1, 6-9.

### 1. The ALJ properly considered the plaintiff's obesity.

The plaintiff argues that the ALJ did not properly consider her obesity when determining her RFC. Docket Entry No. 14-1, at 6-7.

Social Security Ruling ("SSR") 02-01p, which details the Social Security Administration's ("SSA") policy on obesity, provides that, even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's RFC. Soc. Sec. Rul. 02-01p, 2002 WL 34686281, at *1. Accordingly, SSR 02-01p provides that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6.

15

The Sixth Circuit has held that SSR 02-01p does not offer "any particular procedural mode of analysis for obese disability claimants." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. Jan. 31, 2006)). Rather, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* (quoting *Bledsoe*, 165 Fed. Appx. at 412). However, obesity should be evaluated on a case by case basis because it "*may or may not* increase the severity or functional limitations of the other impairment." Soc. Sec. Rul. 02-01p, 2002 WL 34686281, at *6 (emphasis added). An ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of her obesity. *See Coldiron*, 391 Fed. Appx. at 443. The Sixth Circuit has also held that an "ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe*, 165 Fed. Appx. at 412 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The plaintiff testified that she is 5'8" tall and weighs 230 pounds (tr. 27), and the record contains descriptions of her weight and obesity. (Tr. 132, 219, 222, 385-87.) As the defendant points out, the ALJ specifically addressed the plaintiff's obesity and the connection between her complaints of pain and her Body Mass Index ("BMI") of 35.4, indicating Level II obesity.[5] (Tr. 16.) However, even after considering the plaintiff's obesity, the ALJ concluded that the plaintiff's impairments did not preclude her ability to work. The ALJ properly considered the medical evidence

_____

[5] Soc. Sec. Rul. 02-1p, 2002 WL 34686281, at *2 (citing National Institutes of Health ("NIH"), Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998)). Level II obesity includes BMIs of 35.0-39.9. *Id.* BMI describes "the extent of obesity" but does "not correlate with any specific degree of functional loss." *Id.*

of record, including the plaintiff's testimony and the reports of her physicians, and appropriately determined that obesity did not result in any functional limitations.

Moreover, in determining the plaintiff's RFC, the ALJ relied in part on the opinion of Dr. Robinson, who, while considering the plaintiff's obesity in relation to her allegations of knee and back pain, nevertheless found that she was capable of performing light work. (Tr. 15-17, 380-88.) Because the ALJ credited Dr. Robinson's RFC assessment and incorporated his opinions regarding the plaintiff's limitations into the plaintiff's RFC, it was not necessary for the ALJ to address the plaintiff's obesity in any greater detail. *See Bledsoe*, 165 Fed. Appx. at 12.

### 2. The ALJ properly assessed Dr. Henderson's opinion.

The plaintiff argues that the ALJ erred in evaluating Dr. Henderson's opinion and contends that his opinion was entitled to controlling weight. Docket Entry No. 14-1, at 7-9.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[6] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with

---

[6] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

[the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[7] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

---

[7] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting weight given to the treating source.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)).  The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*  If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[8]  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

In discussing Dr. Henderson's opinion, the ALJ found as follows:

The undersigned expressly considered the opinion statements of treating source Henderson regarding claimant's physical and mental functioning . . . ; however, Dr. Henderson indicated "the majority of it is what the patient tells us . . ."  Considering further claimant's presentation with positive Waddell findings and the other inconsistencies above, and that this source did not conduct any mental status evaluations, I consider Dr. Henderson's reliance on claimant's subjective complaints in completing the forms misplaced and they are given no weight.

(Tr. 17; internal citations omitted.)

---

[8] The rationale for the "good reasons" requirement is to provide the plaintiff with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule.  *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

After reviewing the record, the Court concludes that the ALJ properly assessed Dr. Henderson's medical opinion. The ALJ considered Dr. Henderson to be a treating source[9] but determined that his opinion was not well supported and was inconsistent with the other evidence of record and, therefore, was not entitled to controlling weight or any weight whatsoever. The ALJ gave several reasons for discounting Dr. Henderson's opinion that all relate to a general lack of supportability and consistency with the record.

As the ALJ noted, Dr. Henderson's opinion relied heavily on the plaintiff's subjective reports. In a July 23, 2010 treatment note, Dr. Henderson indicated that, "Once I explained that it is possible for us to go ahead and fill out disability paperwork, [the plaintiff] was much better. I see no reason that we cannot do that especially because the majority of it is what the [plaintiff] tells us anyway." (Tr. 437.) In the Medical Source Statement itself, Dr. Henderson indicated that he included lifting and carrying restrictions based on x-rays that he had not seen. (Tr. 440.) Dr. Henderson also included limitations related to the plaintiff's "OCD disorder" and bipolar disorder but did not conduct mental status examinations, leaving the record without evidence to support his findings. (Tr. 437-38, 445.) Additionally, the plaintiff presented to Dr. Henderson with positive Waddell signs, indicating possible malingering, yet Dr. Henderson relied on her reports without further inquiry or explanation. (Tr. 17, 438.) Elsewhere in the decision, the ALJ observed that on the plaintiff's first visit with Dr. Henderson, he diagnosed fibromyalgia, a diagnosis which the ALJ described as "inconsistent with the longitudinal evidence of record and not fully explained nor supported by appropriate clinical findings." (Tr. 13.)

---

[9] Given the relatively short period of time in which Dr. Henderson saw the plaintiff, the Court questions whether an "ongoing treatment relationship" was established sufficient to confer treating source status on Dr. Henderson.

The ALJ chose not to adopt Dr. Henderson's opinion, or to give it any weight, because Dr. Henderson clearly included limitations that were based solely on the plaintiff's self reports and because his opinion was not consistent with the other medical evidence of record. These are "good reasons" for discounting Dr. Henderson's opinion, and they are supported by the record. The Court concludes that the ALJ complied with the treating source rule when evaluating Dr. Henderson's opinion.

### 3. The ALJ failed to consider the plaintiff's impairment of interstitial cystitis after step two, and the error is not harmless.

The plaintiff argues that the ALJ erred by failing to consider how interstitial cystitis may affect her ability to work. Docket Entry No. 14-1, at 6.

As the ALJ noted, the plaintiff received treatment for interstitial cystitis, urinary incontinence, and urinary frequency. (Tr. 13.) She testified that she needs to use the bathroom approximately "every 30 minutes to an hour" and that, on a "bad day," she needs to use the bathroom every 15 minutes. (Tr. 33.) The VE testified that the types of jobs she identified in response to hypothetical questions from the ALJ would not be available to a person who needed to take a restroom break every 15 minutes. (Tr. 42.) At step two, the ALJ found that the plaintiff had a combination of impairments that were severe including "interstitial cystitis with frequent and painful urination." (Tr. 12.) However, when determining the plaintiff's RFC, the ALJ did not include any limitations related to interstitial cystitis or frequent and painful urination, nor did he explain his decision not to do so. (Tr. 15-17.) In fact, after making his step-two finding, the ALJ did not mention the plaintiff's bladder or urinary problems again.

As the Sixth Circuit has observed, "[w]hen an ALJ determines that one or more impairments is severe, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.''" *Fisk v. Astrue*, 253 Fed. Appx. 580, 583 (6th Cir. Nov. 9, 2007) (citing Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5). *See also White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 787 (6th Cir. Feb. 24, 2009) ("Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe."). To do otherwise and fail to consider all of a plaintiff's impairments in the remaining steps of the disability determination process constitutes reversible error. *See, e.g., Hicks v. Comm'r of Soc. Sec.*, 2013 WL 3778947, at *2-3 (E.D. Mich. July 18, 2013); *Stephens v. Astrue*, 2010 WL 1368891, at *2 (E.D. Ky. Mar. 31, 2010).

In this case, despite finding at step two that the plaintiff experienced "interstitial cystitis with frequent and painful urination," the ALJ did not address this impairment at later stages in the five-step process. In particular, the ALJ failed to consider whether any limitation related to frequent and painful urination should have been included in the plaintiff's RFC and, consequently, whether any such limitation would affect the availability of jobs at steps four and five. Although the ALJ discussed the plaintiff's testimony regarding her urinary frequency, as well as her treatment history with Dr. Whitfield, in some detail at step two, the ALJ failed to discuss the plaintiff's urinary difficulties at any later step in the disability determination process. Notably, none of the ALJ's hypothetical questions to the VE included a limitation related to urinary frequency. (Tr. 40-42.)

The ALJ is not required to include limitations in the hypothetical questions to the VE, or in his RFC determination, that are not supported by the record or otherwise not credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993) ("It is well established that

an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). However, when the ALJ finds that an impairment is severe at step two, he must consider that impairment, as well as all other impairments, at the remaining steps of the five-step process, and if the ALJ determines that an impairment does not cause functional limitations or should otherwise not be included in the plaintiff's RFC, he should explain his reasoning. The ALJ failed to do so in this case.

The defendant argues that the record does not support the limitations alleged by the plaintiff.[10] Docket Entry No. 15, at 11-13. However, while this may be true, it is the role of the ALJ and not the role of the Court to weigh the evidence. The ALJ found that the plaintiff experienced "frequent and painful urination" (tr. 12), and, to the extent that the ALJ determined that such urinary difficulties did not warrant inclusion in the plaintiff's RFC, it was incumbent upon the ALJ to explain his reasons. In determining the plaintiff's RFC, the ALJ was required to consider her impairment of interstitial cystitis with urinary frequency and pain and, if he concluded that it did not cause her any further work-related limitations, refer to the evidence supporting his conclusion. Because the ALJ failed to do so, the Court concludes that the ALJ's decision is not supported by substantial evidence.

---

[10] The defendant frames the alleged error as concerning "the ALJ's refusal to adopt . . . certain vocational expert testimony regarding [the plaintiff's] frequent and painful urination." Docket Entry No. 15, at 11. However, the Court finds that the ALJ's error was not specifically related to the VE's testimony that a person who needed to take bathroom breaks every fifteen minutes would be unable to perform the identified jobs. Rather, the ALJ's error was in failing to consider the plaintiff's impairment of "interstitial cystitis with frequent and painful urination" at the remaining steps of the five-step process.

## IV.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) be GRANTED to the extent that the case should be REMANDED for consideration of the plaintiff's interstitial cystitis with frequent and painful urination at the remaining steps of the disability determination process.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

24